**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JAMES RODENBUSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:25-cv-2230 |
| v. | ) | |
| | ) | JURY DEMANDED |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

### COMPLAINT AND JURY DEMAND

---

Comes now Plaintiff James Rodenbush, by counsel, and makes his complaint against the Trustees of Indiana University and the Media School of Indiana University as follows:

### STATEMENT OF THE CASE

This is a civil rights action brought by Plaintiff James Rodenbush to seek relief pursuant to 42 U.S.C. § 1983 for Defendant's violation of his rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

Freedom of the press and academic freedom are sacrosanct in the American imagination. But Indiana University, where one might assume that critical thought and awareness of local and global current events are encouraged, is the third worst college

1

in the country for freedom of speech.[1]  In a direct assault on the rights guaranteed by the First Amendment, IU fired James Rodenbush when he refused the directive to censor student work in the campus newspaper and print only fluff pieces about the upcoming homecoming festivies.

This lawsuit seeks declaratory and injunctive relief related to this blatant violation of Mr. Rodenbush's First and Fourteenth Amendment rights, as well as his rights under the Indiana Constitution. This case presents the Court with an opportunity to serve its originally intended purpose: as a check on the executive and legislative branches, and to show the people of Indiana that it will not bend to the will of a government that suppresses the speech of its citizens and silences the press.

## PARTIES

1.      Plaintiff James ("Jim") Rodenbush is an American citizen and a resident of Indiana; he may be served through his lawyers, whose contact information appears below.

2.      Defendant Trustees of Indiana University (hereinafter "Indiana University" or "IU") is the legal name of the public educational institution under the laws of the State of Indiana; it is comprised of nine members, and they, as a Board, have the responsibility for making rules and regulations to govern the University. The composition and selection of these Trustees is prescribed by statute. *See* Ind. Code § 21-

---

[1] See *College Free Speech Rankings: Indiana University,* TheFIRE.org (Foundation for Individual Rights and Expression) https://rankings.thefire.org/campus/151351-indiana-university?demo=all&year=2025

20-3. Defendant may be served through the Office of the Vice President and General

Counsel, Anthony Prather, Bryan Hall Room 211, 107 South Indiana Avenue,

Bloomington, IN 47405.

## VENUE AND JURISDICTION

3.      Mr. Rodenbush is seeking relief for the violation of the rights guaranteed

to him by the U.S. Constitution and is bringing his claims pursuant to 42 U.S.C §§ 1983

and 1988, therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. §

1331.

4.      This Court has supplemental jurisdiction over Mr. Rodenbush's state law

claims pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or

controversy as his federal claims.

5.      Venue in proper in this Court pursuant to 28 U.S.C. § 1391 because the

events described herein occurred in the Southern District of Indiana.

6.      Declaratory and injunctive relief is authorized by Rule 57 of the Federal

Rules of Civil Procedure and 28 U.S.C. §§ 2201-02.

## BACKGROUND INFORMATION AND FACTUAL ALLEGATIONS

7.      Benjamin Franklin once wrote, "Freedom of speech is a principal pillar of

a free government; when this support is taken away, the constitution of a free society is

dissolved, and tyranny is erected on its ruins." Benjamin Franklin, On Freedom of

Speech and the Press, The Pa. Gazette, Nov. 1737, reprinted in The Works of Benjamin

Franklin, Vol. II, 285 (Philadelphia, Hilliard, Gray & Co. 1840).

8.    Thomas Jefferson said, "were it left to me to decide whether we should have a government without newspapers or newspapers without a government, I should not hesitate a moment to prefer the latter." Letter from Thomas Jefferson to Edward Carrington (Jan. 16, 1787) (available at

https://founders.archives.gov/documents/Jefferson/01-11-02-0047).

9.    Upon presenting the Bill of Rights to Congress in 1789, James Madison said, "the liberty of the press is expressly declared to be beyond this reach of this government[.]" Cong. Register, II, 205-6 (also reported fully in N.Y. Daily Advertiser, 17 Aug. 1789, and Gazette of the U.S., 19 Aug. 1789),

https://founders.archives.gov/documents/Madison/01-12-02-0224.

10.    In 1946, Encyclopaedia Brittanica Films produced an informational film called *Despotism*, educating viewers about what despotism is and how it takes hold of communities and societies. Despotism, Encyclopaedia Britannica, Inc. (1946) (available at: https://www.britannica.com/video/Encyclopaedia-Britannica-Films-Despotism-1946/-244019). "When a competent observer looks for signs of despotism in a community, he looks beyond fine words and noble phrases." *Id.*

11.    The filmmakers cautioned that in communities where the press is "controlled by only a few people and when citizens have to accept what they are told . . . despotism stands a good chance." *Id.*

12.    The film continues,

And if books and newspapers and radio are efficiently controlled, the people will read and accept exactly what the few in control want them to. Government censorship is one form of control. A newspaper which breaks

the government censorship rule can be suspended. It is also possible for newspapers and other forms of communication to be controlled by private interests.

\* \* \*

What happens in a single community is the problem of its own citizens, but it is also the problem of us all, because as communities go so goes the nation.

*Id.*

13.     On January 20, 2025, his first day in office, President Trump signed Executive Order 14149, which is titled "Restoring Freedom of Speech and Ending Federal Censorship," acknowledging that "Government censorship of speech is intolerable in a free society." Available at: https://www.whitehouse.gov/presidential-actions/2025/01/restoring-freedom-of-speech-and-ending-federal-censorship/.

14.     By May 9, 2025, the American Enterprise Institute – a conservative think tank in Washington DC – published an article critical of the Executive Order, stating: "Sadly, the EO is proving to be little more than optics, a feckless First Amendment façade failing to cloak Trump's vastly more numerous retributive assaults on the freedoms of speech and press." Clay Calvert, Trump's Retributive Attacks on Speech and Press Rights Overshadow His Early Righteous Embrace of Online Free Expression, AEIdeas (May 9, 2025), available at: https://www.aei.org/technology-and-innovation/trumps-retributive-attacks-on-speech-and-press-rights-overshadow-his-early-righteous-embrace-of-online-free-expression/.

15.     Calvert's article notes that, "[t]he Trump administration is also aggressively embracing the role of free-press destroyer, seeking to control or harm

news organizations that don't adopt the president's narrative or convey stories he doesn't like . . . [and that] Trump's attacks on the press also involve civil lawsuits . . . [and] more sweeping anti-press tactics." *Id.*

16.    After that article was written, the attacks on the freedom of the press, so admired and lauded by our Founding Fathers as essential to the health of the republic, became even more outrageous:

    a.    On July 2, 2025, Paramount paid $16-million to settle a $10-billion lawsuit filed by President Trump in October 2024 over an interview with then-vice president and presidential candidate Kamala Harris that had aired on the CBS program *60 Minutes*. Paul Glynn, <u>Paramount to pay Trump $16m to settle 60 Minutes lawsuit,</u> BBC (Jul. 2, 2025), available at: <u>https://www.bbc.com/news/articles/c3w4n8778q2o</u>.

    b.    Around two weeks later, on July 17, 2025, CBS cancelled "The Late Show with Stephen Colbert" – Stephen Colbert was an outspoken critic of President Trump who, days before the cancellation was announced, had publicly called the $16-million settlement "a big fat bribe". Izzy Wagener, <u>Stephen Colbert's Late Night Show Canceled, Sparking Accusations of Political Censorship; Jimmy Kimmel Incident Adds Fuel to the Fire,</u> The Free Speech Project (Oct. 8, 2025), available at: <u>https://freespeechproject.georgetown.edu/tracker-entries/stephen-colberts-late-night-show-canceled-sparking-accusations-of-political-censorship-jimmy-kimmel-incident-adds-fuel-to-the-fire/</u>.

c. On September 17, 2025, ABC suspended late night comedian Jimmy
Kimmel – another outspoken critic of the President – ostensibly for
comments he made related to the murder of Charlie Kirk; he was only
reinstated after public outcry resulted in in a mass exodus of
subscribers to Disney+ and Hulu streaming services. Sian Cain and
Oliver Holmes, <u>Jimmy Kimmel Live! suspended over Charlie Kirk
comments after US government pressure</u>, The Guardian (Sept. 18,
2025), available at: <u>https://www.theguardian.com/tv-and-
radio/2025/sep/18/jimmy-kimmel-live-suspended-indefinitely-after-
hosts-charlie-kirk-comments</u>; and Adrian Horton, <u>Disney+ and Hulu
cancellation rates doubled after Kimmel suspension,</u> The Guardian
(Oct. 20, 2025), available at: <u>https://www.theguardian.com/tv-and-
radio/2025/oct/20/disney-hulu-cancelled-subscriptions-jimmy-
kimmel-suspension</u>.

d. On October 3, 2025, an Emmy-award winning Salvadorian journalist
was deported after being arrested covering a "No Kings Day"
demonstration in June, and at least one other foreign journalist has
been detained since then, likely because he was critical of Israel.
Ramon Antonio Vargas, <u>Atlanta journalist says he 'won't be the only'
one deported by Trump officials</u>, The Guardian (Oct. 28, 2025),
available at: <u>https://www.theguardian.com/us-
news/2025/oct/28/journalist-mario-guevara-trump-ice-</u>

deportations?utm_term=6900c7b05995200716724224188043af&utm_ca
mpaign=USMorningBriefing&utm_source=esp&utm_medium=Email
&CMP=usbriefing_email.

    e.    Two weeks ago, former Fox & Friends Weekend co-host and current

"Secretary of War" (as we are apparently supposed to call him now)

Pete Hegseth instituted such restrictive policies on the press at the

Pentagon that almost every single reporter refused to accept them and

walked out. Reuters, the Associated Press, Bloomberg News, The New

York Times, The Wall Street Journal, The Washington Post, CNN, Fox

News, CBS, NBC, ABC, NPR, Axios, Politico, The Guardian, The

Atlantic, The Hill, Newsmax, Breaking Defense, and Task & Purpose

all refused to accept the new press access rules. Andrew Goudsward

and Helen Coster, US news outlets reject Pentagon press access policy,

Reuters (Oct. 15, 2025), available at:

https://www.reuters.com/business/media-telecom/us-news-outlets-
reject-pentagon-press-access-policy-2025-10-14/.

17.    Indiana University has been actively working to limit free speech on its

campus for over a year in multiple ways, including the following:

    a.    In April 2024, in anticipation of pro-Palestine demonstrations taking

place on Dunn Meadow on the IU campus, the University enacted an

"Expressive Activity Policy," which, among other things, restricted

students' abilities to protest, make speeches, and circulate petitions;

b.  In April 2024, IU President Pam Whitten[2] attempted to silence the speech of students with the threat of violence, causing forty-one faculty members of the History Department[3] to hold an additional vote about the Dunn Meadow policy, stating:

> The History Department faculty is deeply alarmed by recent events. After secretly changing policy overnight about the use of Dunn Meadow, for 55 years an established free-speech zone, President Whitten and Provost Shrivastav brought State Police armed with military-grade weapons onto campus on April 25 and April 27. The State Police needlessly and violently arrested peacefully protesting, unarmed students and faculty. It is impossible for any university to operate under the eyes of snipers. The President and Provost have repeatedly justified their actions on the basis of ensuring "safety" for our community. But students, staff, and faculty are now less safe than ever.

Katy Szpak, <u>Campus units vote against Whitten</u>, Indiana Public Media – WFIU (May 13, 2025) (available at: <u>https://www.ipm.org/2024-05-13/campus-departments-vote-against-whitten</u>).

18.  IU has been helped along its mission to censor and control speech by the Indiana Government:

---

[2] In April 2024, 900 faculty members voted overwhelmingly in favor of a no-confidence resolution for Whitten (93.1% voted no confidence). *See* Michael T. Nietzel, <u>Indiana University Faculty Vote No Confidence In President, Provost</u>, Forbes (Apr. 16, 2024) (available at: <u>https://www.forbes.com/sites/michaeltnietzel/2024/04/16/indiana-university-faculty-vote-no-confidence-in-president-provost/</u>).

[3] Likely *not* coincidentally, as of July 1, 2025, IU's history department was one of the many schools within IU that had its academic offerings affected by a new state budget bill that set "several new public higher education policies, including one involving minimum thresholds for degree productivity." Michael T. Nietzel, <u>Indiana University To Discontinue More Than 100 Academic Programs</u>, Forbes (Jul. 1, 2025) (available at: <u>https://www.forbes.com/sites/michaeltnietzel/2025/07/01/indiana-university-to-discontinue-more-than-100-academic-programs/</u>).

a. On Wednesday, April 23, 2025, the Indiana Legislature introduced a provision in the state's budget bill to give the governor the power to remove and replace alumni-elected members of IU's Board of Trustees. Aubrey Wright, <u>Late addition to budget bill would give Gov. Braun full control of IU trustee seats</u>, WFIU (Apr. 24, 2025) (available at: https://www.wfyi.org/news/articles/late-addition-to-budget-bill-would-give-gov-braun-full-control-of-iu-trustee-seats).

b. The budget was passed, and on May 31, 2025, Governor Braun terminated three trustees, effective immediately, "and replaced two of them with polarizing and well-known conservatives Jim Bopp and Sage Steel." Ethan Sandweiss, *Braun ousts IU trustees, installs conservatives on board*, WFIU (June 2, 2025) (available at: https://www.wfyi.org/news/articles/iu-trustees-removed-governor-mike-braun-new-law).[4]

19.     It is with this knowledge of the sanctity of the freedom of the press and this information about the startling deterioration of that freedom that James Rodenbush brings this lawsuit.

---

[4] "IU administrators have been silent on the legislation that singles out their school, leading some to speculate that they wanted the change." Sandweiss, *Braun ousts*. One of the terminated trustees, Vivian Winston, "withheld her support for Whitten after a no-confidence vote by faculty last spring, opposed an 'expressive activity policy' that was recently blocked in court on a First Amendment basis and voted against Whitten's contract extension." *Id.*

20.     On October 14, 2025, James Rodenbush was fired from his position as the Director of Student Publications at Indiana University; a role which he had been in since July 2, 2018.

21.     The decision to fire Rodenbush came after he refused to censor the students' work for the October 16, 2025 print paper.

22.     As Director of Student Publications, Rodenbush's duties included the daily management of the *Indiana Daily Student* ("IDS"), which, until very recently was the longest-running print student newspaper in the country.

23.     As his preliminary offer letter indicated, the IDS "is editorially independent, by charter."

24.     The referenced charter, originally approved for the IDS in 1969 and revised and readopted in 2005, is titled "Independent Student Media of News, Information and Ideas Bloomington Campus, Indiana University"; it "reaffirms that student media operating under [the Charter] are declared limited public forums where final content decisions and responsibility rest with duly appointed senior editors and managers." See https://www.idsnews.com/page/charter.

25.     In the weeks and months leading up to the termination of his employment, the IU Administration had directed Rodenbush to stop the students from printing any news.

26.     During the spring semester of 2025, Associate Dean Galen Clavio told Rodenbush that administrators were expressing frustration about news stories being included in the special editions.

27.    By that time, *only* special editions were being printed (seven per semester), rather than the previous weekly editions, as "a cost-cutting measure." Brian Rosenzweig, <u>Timeline of mounting tensions between Indiana University leaders and student newspaper,</u> The Herald Times (Oct. 16, 2025) (available at: https://www.heraldtimesonline.com/story/news/local/2025/10/16/timeline-iu-cutting-indiana-daily-student-ids-print-newspaper-adviser-jim-rodenbush-fired/86714327007/).

28.    The week after the September 4th edition of the IDS was published, Rodenbush was called into a private meeting with Clavio, who asked him why the print editions of the paper still carried news stories.

29.    Rodenbush passed the University's concerns along to the IDS staff.

30.    During an IDS staff meeting on September 25, 2025, with Rodenbush, two members of the IDS professional staff, and one other member of the Media School administration, Clavio asked why there was still news in the upcoming print edition of the paper.

31.    At that meeting, Rodenbush told Clavio that he did not control what students published in the IDS and that any statement directing students not to publish news in the print edition could not come from Rodenbush.

32.    Rodenbush said that restricting the content in the paper was the "definition of censorship."

33.    Rodenbush also recognized that Clavio's instructions would require him to violate the Charter.

34.     After the September 25, 2025 meeting, during which Rodenbush was berated in front of his colleagues and other administrators, Rodenbush contacted IU human resources person Rebecca Stanze to find out about filing a formal grievance.

35.     On September 26, 2025, Rodenbush indicated to Ms. Stanze in writing that the following category applied to his grievance: "An employee may file a grievance alleging that they have been or are being adversely affected by an improper application or interpretation of an employment related rule, regulation, policy, or procedure that is not specifically excluded below."

36.     Ms. Stanze replied to Rodenbush that she would set up the necessary meeting for him to discuss his grievance with David Tolchinsky, the Dean of the Media School; the meeting was ultimately scheduled for October 9, 2025.

37.     In an October 7, 2025 email, Rodenbush passed on the "guidance" from the Media School administration that the IDS's print publication should solely focus on a special theme and contain "no other news at all, and particularly no traditional front page news."

38.     The IDS had been instructed to print only fluff pieces about IU's upcoming homecoming and no news.

39.     The Administration's guidance that the IDS restrict their content to propaganda about IU's football program and the appurtenant pageantry was an expectation, not a suggestion.

40.     Rodenbush refused to enforce the Media School's "guidance".

41.     In the October 9, 2025 meeting (which was scheduled as the first step of Rodenbush's grievance process through HR), Rodenbush told Tolchinsky that the administration's interference in the content of the print edition of the IDS and its demand that no news be printed violated the First Amendment's guarantee of freedom of the press.

42.     Tolchinsky told Rodenbush that it was his expectation that Rodenbush's position would function as a traditional newspaper publisher – someone who could determine content – and that if Rodenbush did not agree, then student media would need to be reevaluated.

43.     Five days later, on October 14, 2025, Rodenbush was fired.

44.     Despite having never had a negative performance review, and without any notice or opportunity to be heard, Rodenbush was fired "effective immediately" for his "lack of leadership and ability to work in alignment with the University's direction for the Student Media Plan." [Ex. A, October 14, 2025 Termination Letter].

45.     Rodenbush was advised, "leadership has lost trust in your ability to lead and communicate appropriately on behalf of the University." [Id.]

46.     James Rodenbush was fired because he refused to toe the party line, and because he refused to force the student journalists he supervised to kowtow to the edicts of the Governor Braun-installed University Trustees.

47.     The next day, the print newspaper had been stopped indefinitely.

48.     Rodenbush was fired in retaliation for his First Amendment-related complaints, and for refusing to censor the students' work.

49.     The October 16th print publication of the IDS that was never allowed to be printed included an article about how "[a]ll of Indiana's major electric utilities have halted or reversed plans to transition to clean energy," and how, "[i]n 2024, Duke Energy delayed the planned closure of its coal plant in Gibson County from 2035 to 2038[.]" *See* Ex. B, October 16, 2025 edition of the Indiana Daily Student, A2 (Ella Curlin, Utilities fall back on goals amid AI data center boom), available at:

https://issuu.com/idsnews/docs/indiana_daily_student_homecoming_eedition_-_thursd.

50.     On April 10, 2025, just about two weeks before he was given the power to appoint the IU Board of Trustees, Governor Braun issued two executive orders related to Indiana's coal industry that would have the effect of increasing utility bills and pollution for Indiana citizens. Edward Smith, Braun Follows Trump Executive Orders Bailing Out Dirty & Expensive Coal Power Plants, Sierra Club (Apr. 11, 2025) (available at: https://www.sierraclub.org/press-releases/2025/04/braun-follows-trump-executive-orders-bailing-out-dirty-expensive-coal-power).

51.     Another article that was set to be published in the October edition of the IDS reviewed a documentary critiquing IU's administration and attacks on freedom of expression, including the April 2024 events in Dunn Meadow and the Governor's legislated interference with the Board of Trustees. Ex. B, Ian Collier, Filmmakers say free speech 'worth fighting for' in documentary, IDS, A2 (Oct. 16, 2025).

52.     That article ends, "IU is worth fighting for. Free speech is worth fighting for." Id.

53.     Upon information and belief, IU restricted this speech specifically because of its content, and when Rodenbush complained about, and refused to comply with, Defendant's unconstitutional viewpoint discrimination, he was fired.

54.     The unpublished October edition of the IDS shows how much revenue was lost as a result of the decision to cancel the printing; the three print editions this year have run almost $11,000 in profit. *See* Ella Curlin, Why Did Indiana University Axe Its Award-Winning Print Newspaper?, The Nation. (Oct. 24, 2025) (available at: https://www.thenation.com/article/society/indiana-university-student-newspaper-censorship/).

55.     In the days since Rodenbush was fired, IU alumni have pulled over $1-million in donations to the school. Cate Charron, IU alumni pull $1M-plus in donations amid fight over control of student newspaper, Indianapolis Star (Oct. 27, 2025), available at: https://www.indystar.com/story/news/education/2025/10/27/iu-alumni-pull-donations-over-ids-student-newspaper-censorship-claims/86851411007/.

56.     There is not, and never was, a legitimate pedagogical reason for the prior restraint on the speech of IU students through the IDS.

**CAUSES OF ACTION**

**Count 1: Violation of Rights Guaranteed by the First Amendment to the Constitution**
**42 U.S.C. § 1983**

57.     The foregoing allegations are incorporated by reference as though fully restated herein.

58.    The First Amendment states, "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]" U.S. Const. amend. I.

59.    The First Amendment was made applicable to the states by the Fourteenth Amendment.

60.    As a state university newspaper, the IDS is entitled to the constitutional protections afforded the press. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 41 L.Ed.2d 730, 94 S.Ct. 2831 (1974); *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 35 L.Ed. 2d 618, 93 S.Ct. 1197 (1973); *Healy v. James*, 408 U.S. 169, 33 L.3d.2d 266, 92 S.Ct. 2338 (1972).

61.    The First Amendment protections afforded to a state university newspaper include discretion regarding style and content. *Id.* (citing *Miami Herald Publ'g Co.*, 418 U.S. at 258).

62.    State intrusion into this process violates the First Amendment freedom of press.

63.    Defendant's intrusion into the editorial decisions about what content could be published in the IDS violated the First Amendment.

64.    Defendant's termination of Rodenbush's employment because he refused to censor the students' work in the IDS, and because of his complaints regarding IU's restriction of free speech rights, is retaliation in violation of the First Amendment.

65.    The matter of what information is published in the IDS, as well as the speech restrictions placed on students and faculty by a public university, is a matter of public concern.

66. Defendant had no constitutionally viable reason for its actions.

67. Defendant's excuse that the print newspaper was cut for budgetary reasons is merely pretext.

68. The print edition had been profitable in 2025.

69. In 2024, billionaire alumnus Mark Cuban had donated more than enough to fund the IDS and not run a deficit. Scott Horner, <u>Mark Cuban is unhappy with Indiana University's decision to stop printing student newspaper: 'Censorship isn't the way'</u>, Indianapolis Star (Oct. 15, 2025) (available at:

<u>https://www.indystar.com/story/sports/college/indiana/2025/10/15/mark-cuban-indiana-university-newspaper-journalism-reaction-jim-rodenbush-censorship-donation/86715728007/</u>).

## Count 2: Violation of Procedural Due Process Rights Guaranteed by the Fourteenth Amendment to the Constitution
### 42 U.S.C. § 1983

70. The foregoing allegations are incorporated by reference as though fully restated herein.

71. The Fourteenth Amendment's Due Process Clause protects against the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

72. Rodenbush had a property interest in his continued employment with IU and the benefits of that employment.

73. Defendant, acting under color of state law, terminated Rodenbush's employment without any notice or opportunity to be heard.

**Count 3: Violation of Rights Guaranteed by the Article 1, Section 9 to the Indiana Constitution**
**Seeking Equitable Relief Only**

74.     The foregoing allegations are incorporated by reference as though fully restated herein.

75.     Article 1, Section 9 to the Indiana Constitution states: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

76.     "The textual sweep of this provision is every bit as broad as the provisions regarding a free press in Amendment I of the Constitution of the United States." *Gintert v. Howard Publications*, 565 F. Supp. 829, 837 (N.D. Ind. 1983).

77.     Defendant's termination of Rodenbush's employment in response to his refusal to censor the IDS violates the right to freedom of speech enshrined in the Indiana Constitution.

78.     Rodenbush makes no claim for money damages under this count.

79.     Rodenbush seeks declaratory relief in the form of an order of the Court stating that Defendant's actions violated the Indiana Constitution.

## DAMAGES

80.     As a result of Defendants' unlawful conduct, James Rodenbush is entitled to compensatory damages, including damages for embarrassment, humiliation, emotional distress, and mental anguish.

81.    Mr. Rodenbush is further entitled to punitive damages for the willful, wanton, oppressive, and malicious conduct of Defendant, as set forth above.

82.    Pursuant to 42 U.S.C. § 1988, Mr. Rodenbush is entitled to his costs and attorneys fees in bringing and maintain this action, plus interest.

## DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

83.    The foregoing allegations, averments, and statements are incorporated by reference as though fully restated herein.

84.    Plaintiff requests this Court issue a declaratory judgment deeming:

    a.    Defendant's demand that the IDS print no news in its print newspaper censorship in violation of the First Amendment to the U.S. Constitution and Article 1, Section 9 to the Indiana Constitution;

    b.    Defendant's cancellation of the IDS print newspaper in response to the students' refusal to comply with Defendant's demand to be censorship and retaliation in violation of the First Amendment to the U.S. Constitution and Article 1, Section 9 to the Indiana Constitution; and

    c.    Defendant's termination of James Rodenbush's employment employment for refusing to participate in Defendant's unconstitutional attempts to censor the IDS to be retaliation in violation of the First Amendment to the U.S. Constitution and Article 1, Section 9 to the Indiana Constitution.

85.     Plaintiff further requests that he be granted permanent injunctive relief in the following forms:

    d.  That Defendant reinstate him to his full administrative and teaching duties;

    e.  That Defendant be required to clear his record in regard to any disciplinary actions taken in unlawful violation of his rights; and

    f.  That Defendant be enjoined from disclosing any information with regard to his discipline in any context, including but not limited to any letters of recommendation or reference.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff James Rodenbush prays that judgment will be entered in his favor and against Defendants, that the Court grant declaratory relief and injunctive relief as described above, that he be awarded compensatory and punitive damages in an amount to be determined at trial, for costs attorneys' fees pursuant to 42 U.S.C. § 1988, for pre- and post-judgment interest, and for all other relief just and proper in the premises.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

*s/ Jessica Wegg*
Jessica Wegg, jessica@sllawfirm.com
Jonathan Little, jon@sllawfirm.com
Daniel J. Canon, dan@sllawfirm.com
Annemarie Alonso, annie@sllawfirm.com
SAEED & LITTLE, LLP
#189 – 133 W Market St
Indianapolis, IN 46204
(812) 320-3367

*Counsel for Plaintiff, James Rodenbush*